1   David Kessler, pro se
2   2715 Steiner Street, San Francisco, CA 94123
3   Telephone: 415 929 1199
4   Fax: 415 929 1131
5   Email: davidkesslermd@aol.com
6                                        E-filing

7

8                  IN THE UNITED STATES DISTRICT COURT

9               FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

11   DAVID A. KESSLER,                    )
12   Plaintiff                            )   CASE NO. _____
13           v.                           )   COMPLAINT AND
14   J. MICHAEL BISHOP,                   )   DEMAND FOR JURY TRIAL
15   ROBERT DYNES,                        )   DECEMBER 12, 2008
16   MARK YUDOF,                          )
17   "JANE/JOHN DOE,"                     )
18   Defendants                           )
19

20   Plaintiff David A. Kessler ("Kessler") for his complaint against Defendants J. Michael Bishop

21   ("Bishop"); Robert Dynes ("Dynes"); Mark Yudof ("Yudof") and "Jane/John Doe" ("Doe"),

22   on information and belief states the following:

23                            NATURE OF CASE

24   1. Plaintiff Kessler brings this legal action seeking legal, declaratory, and equitable relief and

25   for compensatory and punitive damages pursuant to 42 U.S.C. §1983 because he was unlawfully

26   dismissed from his position as Dean of the School of Medicine and Vice Chancellor, Medical

27   Affairs at the University of California, San Francisco (UCSF) in retaliation for both speech and

28   petition activities that highlighted false and misleading financial records prepared by University

1    of California ("University") officials. Under color of state law, defendants Bishop and Dynes

2    violated Kessler's rights as protected by the First and Fourteenth Amendments of the United

3    States Constitution and University policies assuring "full first amendment protection." Under

4    color of state law, defendants Bishop, Dynes, and Doe conspired to violate Kessler's rights to

5    free speech and petition for redress of grievances and freedom from retaliation.

6                                    THE PARTIES

7    2. Kessler is and has been at all relevant times an adult citizen of the State of California.

8    3. Bishop is and has been at all relevant times an adult citizen of California. He is the

9    Chancellor at UCSF, a part of the University, and is sued in his personal and official capacity.

10   Bishop at all relevant times has been a State of California government employee.

11   4. Dynes is and has been at all relevant times a citizen of California. He was President of the

12   University, a state government entity. He is sued in his personal capacity. Dynes at all relevant

13   times has been a State of California government employee.

14   5. Yudof succeeded Dynes as President of the University. He is an adult citizen of California.

15   Yudof has been a State of California government employee since June 16, 2008. He is sued in

16   his official capacity. Yudof has the authority delegated by the Board of Regents of the

17   University to assure that the University is in compliance with all laws and regulations. Yudof

18   has authority to implement any prospective relief this Court should direct.

19   6. Jane and John Doe are unknown adult citizens who are co-conspirators and who acted in

20   concert with Bishop and Dynes' retaliatory actions and who acted under color of state law. The

21   existence of these co-conspirators is suggested in two documents. First, a letter requesting

22   Kessler's resignation from Bishop to Kessler, June 29, 2007, p. 2., states, "...this decision has

2 Complaint

1    been discussed at the highest levels of the University and is uniformly supported as being in the

2    best interests of the Campus and University." Second, a letter from Bishop to State Senator Aldo

3    Maldonado on March 7, 2008 highlights that Bishop engaged in "extensive consultations" in

4    concert with his actions. Only through discovery can the identity and motives of these

5    individuals be known.

6                               JURISDICTION

7    7. At all times relevant to this complaint, defendants Bishop, Dynes, and Doe acted under color

8    of law and under color of the orders, regulations, policies, customs, and/or usages of the

9    University of California. The jurisdiction of this Court is invoked under Title 28 U.S.C.

10    Sections 1331 and 1343, this suit being authorized by 42 U.S.C. Section 1983.

11                                 VENUE

12    8. Venue is appropriate in this Court because a substantial amount of the acts giving rise to this

13    lawsuit occurred in this district.

14                     INTRADISTRICT ASSIGNMENT

15    9. This lawsuit should be assigned to the San Francisco Division of the Northern District of

16    California because a substantial part of the actions complained of in this complaint occurred in

17    San Francisco County.

18                 STATEMENT OF GENERAL FACTS

19    10. During Kessler's recruitment to UCSF and prior to his accepting the offer to become Dean,

20    as part of his due diligence, Kessler requested and received various documents ("the

21    documents") from UCSF officials purporting to show the financial condition of the Medical

22    School ("the School"), including actual and projected revenues available to the Dean, and

1   related expenses. After Kessler's arrival and the arrival of a new Vice Dean for Finance and

2   Administration for the Medical School, Kessler again requested financial information about the

3   Medical School and became aware of major discrepancies in financial reporting. The

4   discrepancies in revenue between what was represented and what was actually available as

5   revenue were substantial. In the course of Kessler's discoveries, he shared the School's

6   financial information with UCSF and University officials.

7   11. Kessler's sharing of financial information with UCSF officials outside of the School

8   apparently spurred a series of anonymous letters, beginning in February, 2005, disseminated

9   throughout the state to press, political leaders, and Chairs and other members of the faculty of the

10   School. These letters, which attacked Kessler on a number of fronts, personal as well as

11   professional, contained details known only to those who had been involved with the provision of

12   the financial information during Kessler's recruitment. Kessler was attacked, in the words of the

13   letters, because Kessler "open[ed] the financial books and records of the …School of Medicine

14   to the Medical Center and the Chancellor's office…."

15   12. These anonymous letters were treated as Whistleblower Complaints and an audit ensued.

16   After years of investigation, none of the allegations against Kessler were found to be sustained.

17   13. Kessler was persistent, over the course of nearly two and a half years that the auditors took

18   to issue their report, that the financial discrepancies he had found should be investigated. At one

19   point, he uncovered multiple, different revenue numbers, on multiple spreadsheets, for the same

20   closed fiscal year.

21   14. As the University delayed investigating the accuracy of these financial documents, Kessler,

22   as a private citizen, engaged counsel to analyze and petition the University concerning the

23   accuracy and integrity of the University's financial documents and systems. In addition, Kessler,

4  Complaint

1   despite admonitions by University officials to the contrary, raised with University officials

2   concerns and repeatedly petitioned the University to address the issues in the financial

3   documents.

4   15. Kessler attempted to ascertain the truth about the financial issues, often in the face of

5   noticeable dissatisfaction among those with whom he had no choice but to lodge his concerns.

6   On May 18, 2007, counsel for Bishop and Dynes, representing UCSF's position, maintained in a

7   letter that the financial information Kessler had been given during his recruitment was

8   "accurate," that "what is most disturbing is that Dean Kessler continues to make spurious

9   accusations...," and that Kessler should "bring closure to the financial issues" that Kessler had

10  been raising. University officials tried, at one point in the letter, to claim that University officials

11  never gave Dr. Kessler the financial information he received. And that was false.

12  16. Bishop and Dynes' representatives became concerned that Kessler would petition to seek

13  redress of grievances in the courts.

14  17. Confronted with the University's asserting that the information was "accurate," Kessler had

15  counsel with expertise in financial transactions prepare a response to the May 18th letter. This

16  response was a detailed analysis of the underlying documents that had served as the basis for the

17  information that he had been given. That analysis documented that the financial information

18  given to him during his recruitment: a) used restricted funds for student scholarships, student

19  research, and emergency loan assistance for purposes other than student needs; (b) falsely

20  portrayed one-time fund balances as recurring income, with repeated-counting of fund balances

21  as income where no income existed; (c) included restricted income without depicting the

22  expenses for which those funds were designated; and (d) does not reconcile to the University's

1  general ledger. That analysis was given to the University on June 13, 2007 and requested that

2  the University have its own outside financial experts review the financial information.

3  18. Kessler shared the June 13th document he had prepared, as a citizen, with Richard Blum

4  ("Blum"), member of, and ultimately Chairman of, the Board of Regents for the University, at

5  his request, a few days later. After reviewing the materials Kessler submitted, Blum called to tell

6  Kessler on June 18, 2007 that the financial information the University had prepared was

7  incorrect, and that an apology would be issued.

8  19. Within days, on June 29, 2007, Bishop, at a meeting in the Chancellor's office, in the

9  presence of University Provost Rory Hume, handed Kessler a letter requesting that he step down

10  as Dean by January 1, 2008. The letter stated that there were "distressing reports of mounting

11  dissatisfaction with your leadership within the Campus and University…" and among important

12  supporters of UCSF and that "[t]hese circumstances are undermining morale, impeding the

13  conduct of university business, and damaging support for the School and Campus in the San

14  Francisco community." Despite his requests for specificity, Kessler never was told the substance

15  of these "distressing reports." Bishop stated in the letter that Kessler's resignation "would be in

16  the best interests of the Campus and the University."

17  20. On July 5, 2007, Bishop sent Kessler a letter stating that he could see how Kessler might

18  have been misled by the financial information provided to him during his recruitment and

19  apologized on behalf of the University. University counsel subsequently related that Kessler

20  could not divulge the contents of the letter.

21  21. In a telephone call to Kessler on the morning of July 13, 2007, Blum stated, regarding his

22  termination, that Kessler's raising the "financial stuff [was] the cancer." He went on to say, "If

23  you piss people off for the right reason, [they're going to] figure some way to get back at you."

6  Complaint

1    22. During the course of the summer, 2007, Kessler attempted to negotiate a settlement with

2    University officials. Those attempts were unsuccessful. Non-binding, confidential mediation

3    was held on December 13, 2007. During the months prior to mediation, Kessler's counsel

4    requested, among other documents, all documents that might suggest negative job performance

5    or complaints from donors. Not one document from any supervisor or donor suggested any

6    negative appraisal of Kessler's performance.

7    23. On December 13, 2007, during the mediation proceeding, counsel for the University handed

8    Kessler typed, signed letters from Bishop and Dynes terminating his employment as Dean and

9    Vice Chancellor, Medical Affairs, effective immediately, stating that Kessler must remove his

10   possessions from the Dean's office by the end of the weekend.

11   24. On June 27, 2008, Charles Robinson, University general counsel representing Yudof and

12   Bishop, and for whom Yudof has supervisory responsibility, threatened Kessler with legal action

13   which, on information and belief, was in retaliation for Kessler's speech and petition activities.

14           COUNT I -- SECTION 1983 RETALIATION IN VIOLATION OF THE SPEECH

15                   PROVISIONS OF THE FIRST AMENDMENT

16   25. Defendants Bishop and Dynes, acting under color of state law, retaliated against Kessler in

17   violation of his First Amendment rights to freedom from retaliation and free speech. Plaintiff

18   incorporates all facts *supra*.

19   26. Kessler at all time relevant was an employee, faculty member, and a member of the

20   University Academic Senate. The position of Dean requires Kessler to be a member of the

21   faculty. The University Academic Personal Manual states, "Members of the faculty are entitled

22   as University employees to the full protections of the Constitution of the United States and of the

7 Complaint

1 Constitution of the State of California. These protections are in addition to whatever rights,

2 privileges, and responsibilities attach to the academic freedom of university faculty."

3 27. University Counsel wrote on May 4, 2006 that the assertions in documents that Kessler's

4 representatives transmitted to the University on April 24, 2006 constituted, "[p]ursuant to the

5 Policy and state statute," a "protected disclosure" and "*must* therefore be treated as a

6 whistleblower complaint irrespective of the complainant's self description." [emphasis added]

7 Counsel wrote, "It now appears clear that the Dean is alleging that University employees

8 engaged in improper governmental activities, as that term is defined in the University's *Policy on*

9 *Reporting and Investigating Allegations of Suspected Improper Governmental Activities*

10 *(Whistleblower Policy)."* Counsel further stated that Kessler "*has rights*…pursuant to University

11 policy…as a whistleblower." [emphasis added]. Counsel stated, "The University's actions

12 …will be guided by the Whistleblower Policy. I suggest it may be useful for …the Dean to

13 become familiar with the policy as to the Dean's 'roles, rights and responsibilities…'"

14 28. University policies which prohibited retaliation for "protected disclosure" and which

15 guaranteed "full protections of the Constitution of the United States" were in effect on the dates

16 when Kessler was offered to become a faculty member, Dean, and Vice Chancellor, and

17 throughout all relevant periods in this complaint.

18 29. At no time during his employment with the University did Kessler surrender or did the

19 University place any conditions on the terms of employment with respect to his First

20 Amendments rights or his right to be free from retaliation.

21 30. Written communications disclosing information concerning materially false financial

22 information and petitioning for redress were made by Kessler or his personal representatives to

23 University and government officials on, but not limited to, the following dates: April 27, 2005;

1    May 17, 2005; April 24, 2006; May 2, 2006; July 26, 2006; July 31, 2006; August 8, 2006;

2    August 31, 2006; September 11, 2006; May 3, 2007; May 4, 2007; and June 13, 2007.

3    31. Kessler specifically communicated additional information on April 8, 2007 that "evidences

4    the original misrepresentation but it demonstrates, if you study it, the university's cover-up for

5    the last two years."

6    32. Kessler's personal representative stated on April 8, 2007 to University officials that the

7    University has "a problem that on its face implicates a possible multi-million dollar failure of

8    integrity in its financial system."

9    33. Defendants took adverse action against Kessler. On Thursday, December 13, 2007, during

10   the mediation proceeding, counsel for the University handed Kessler typed, signed letters from

11   Bishop and Dynes terminating Kessler's position as Dean and Vice Chancellor - Medical Affairs,

12   effective immediately. The termination letter stated that Sam Hawgood had been appointed

13   interim Dean and that Kessler must remove his possessions from the Dean's office by the end of

14   the weekend. Bishop and Dynes had authority delegated to them to terminate Kessler by the

15   Board of Regents of the University, a state of California government entity.

16   34. Defendants took adverse action against Kessler for impermissible reasons. As noted *supra*,

17   on July 13, 2007, Blum in a call he initiated to Kessler, two weeks after the request for

18   resignation of Kessler, said that Kessler's pressing the "financial stuff" was the "cancer." He

19   said Kessler was "willful" in pressing the financial irregularities and that "there is a cost in a

20   political system to being willful." Blum went on to say, "If you piss people off for the right

21   reason" they will "figure some way to get back at you." He described in detail several personal

22   instances where doing the right thing was met with retaliation.

1  35. Blum was in a special position to view the University's actions. Kessler had reported the

2  financial irregularities to Blum and Blum had numerous conversations with University officials

3  about the issue. In earlier calls to Kessler, Blum called the University's conduct in delaying the

4  audit report "criminal." In other conversations, he asserted that, in the view of University

5  officials, Kessler had created a "poisonous" environment by pressing the financial discrepancies.

6  36. Statements by Bishop and Dynes representatives demonstrate that Kessler's speech and

7  petition activities were a "substantial and motivating factor" that led to the defendants taking

8  adverse action against Kessler:

9  A. "[Y]ou and the Dean are problem creators" (Email from University Counsel Jeffrey Blair

10  ("Blair") dated April 24, 2007 to Kessler's counsel, Martin Michaelson ("Michaelson"), former

11  general counsel of Harvard University);

12  B. "I am fast coming to conclude that you and the Dean are going to criticize the University no

13  matter what happens. You are going to create an Oliver Stone type conspiracy (now including

14  me) that simply does not exist. And you are going to pound on the past instead of looking

15  toward a productive future" (*Id*);

16  C. Representing "UCSF's Position," University counsel wrote, "Dean Kessler...asserts that they

17  depict 'financial incompetence,' 'cooking the books' and 'double booking' gift revenues... these

18  are provocative...serious accusations....and wholly unsupported...I expect that you have

19  properly counseled Dean Kessler about the importance of refraining from making any false

20  statement that could injure UCSF or any of its employees....What is most disturbing is that Dean

21  Kessler continues to make spurious accusations based on a misinterpretation of the records...."

22  (Letter titled "UCSF's Position on Dean's Office Financial Commitments and Resources" from

23  Blair to Michaelson, May 18, 2007);

10 Complaint

1    D. "He [the Dean]...remains solely focused on 'proving his case.'" (Email from Blair, May 16,

2    2007);

3    E. "I remain concerned about some possible ultimate motivation of the Dean principally derived

4    from his apparent insistence in limiting his 'case' to one particular year..." (Email from Blair,

5    April 7, 2007);

6    F. "I find it distressing that Dean Kessler continues to create an innuendo of impropriety.... His

7    latest barrage shows again that Dean Kessler is intently focused on proving he is right..." (Email

8    from Blair, June 14, 2007)

9    37. The above statements made by a senior University official in April, May, and June, 2007,

10    including "UCSF's Position," only weeks before Kessler was asked to step down, describing

11    Kessler as a "problem creator" and as having made "provocative accusations" that are

12    "spurious" and "wholly unfounded," and stating that Kessler is alleging an "Oliver Stone type

13    conspiracy" which the University official found "distressing" and for which Kessler should have

14    been "counseled," indicate a strong level of dissatisfaction with Kessler. The dissatisfaction

15    arose, as the University official stated, because Kessler's speech and petition activities were

16    questioning the University's financial practices.

17    38. Never in the four-year period he worked with Kessler leading up to the request for

18    resignation did Bishop, who was Kessler's work superior, criticize in any way, other than in

19    relation to Kessler's raising the financial discrepancy issue in the course of preparing the audit

20    report, Kessler's performance, or take issue with any decision, action, or judgment of Kessler.

21    In fact, Kessler met almost weekly with Bishop, up to and including December 10, 2007. At the

22    end of each meeting Kessler usually asked whether there was "anything else that I should be

23    focusing on." Never did Bishop criticize to Kessler his performance in any way.

11 Complaint

1   39. Bishop agreed with Kessler that Bishop had never criticized Kessler's job performance when

2   Kessler raised the point during the meeting on June 29, 2007 when Bishop requested Kessler's

3   resignation.

4   40. Bishop specifically related that Kessler was doing a good job.

5   41. Counsel for Kessler requested all documents, including but not limited to, letters, working

6   papers, files, drafts, memoranda, writings in any form, phone records and logs, notes, reports,

7   correspondence, meeting notes, and emails and their attachments pertaining to Kessler's job

8   performance or from or to donors. There is no criticism of Kessler's performance as Dean from

9   any superior or donor in any documents produced by the University.

10   42. The University's Academic Personal Manual requires that a process of consultation with the

11   Chair of the UCSF Academic Senate take place before the Chancellor can end a Dean's

12   appointment. Counsel for the University Michael Kahn ("Kahn") confirmed that Bishop did not

13   follow Academic Personnel Manual Section 240 before requesting Dr. Kessler's resignation.

14   Blair stated, in a meeting with counsel for Kessler during the summer of 2007 that the University

15   had taken that policy "into consideration." For Bishop to knowingly violate University policy is

16   evidence of retaliation.

17   43. The University's personnel policy for senior managers, which applied to Kessler in addition

18   to rules, regulations, and policies governing his Academic Senate membership, requires annual

19   performance evaluations. Bishop did not follow this policy.

20   44. University policy calls for each Dean to be reviewed by a faculty stewardship committee not

21   later than the fifth year of service. Stewardship review lies at the heart of the values of the

22   Academy. They reflect the tenets of shared governance in the running of the University. The

1   reason for a stewardship review, therefore, is to look at a Dean's entire performance from a 360-
2   degree perspective, not focusing on isolated comments. The failure to follow the University's
3   longstanding custom and requirement to conduct a stewardship review makes it highly
4   improbable that defendants can establish that their adverse actions were for legitimate reasons
5   independent of Kessler's protected speech and petition activities. Thus, in this context, to
6   request a resignation of a Dean without any negative performance appraisal and without a
7   stewardship review is evidence of retaliation.

8   45. Bishop's statement in the request for resignation that Kessler's leadership was damaging
9   donor support for the School and Campus is not supported by the facts. While there is no
10  expectation of unanimity, many members of the donor community have expressed strong support
11  for Kessler's vision, energy, and leadership. Evidence that the reasons for terminating Kessler
12  are false is demonstrated by the fact that the Medical School had its best fundraising years in its
13  history under Kessler's leadership. During Kessler's tenure the School of Medicine raised
14  $604,811,131. In FY 2007, the School of Medicine under Kessler's leadership raised
15  $170,023,732, an historic record. Over seventy-five million dollars of philanthropy can be
16  directly related to Kessler's efforts.

17  46. In addition, for defendants to argue that they have relied on the concerns of the UCSF donor
18  community, when they have used the terms "near pathological," "delusional," "irrational," and
19  "no reason with the man" in describing one of UCSF's most important donors and have stated
20  that individuals in the donor community are "creating one scapegoat after another" raises serious
21  questions about the defendants' credibility.

22  47. In the meeting with Kessler to request his resignation, Bishop stated that Kessler was "not
23  easy to work with." Yet, on the next day, in a meeting with the Executive Vice Dean of the

1    Medical School, Bishop regretted this statement and noted that it was not true. Defendants'

2    contradictions, inconsistencies, and "shifting explanations" in the reasons for the request for

3    resignation are evidence of retaliation.

4    48. For nearly three years Kessler sought answers to questions about the University's financial

5    information. University officials refused to answer the most elementary questions as to the basis

6    for their accounting treatments. His questioning was met with hostility, as seen above. By

7    terminating Kessler as Dean, defendants sought to obscure the facts regarding the financial

8    issues.

9    49. In response to questions raised by California State Senator Abel Maldonado ("Senator

10   Maldonado") about the accuracy of the financial information after dismissal of Kessler,

11   defendant Bishop wrote, "there was no misrepresentation because the data….has [*sic*] been

12   verified by…KPMG as substantially accurate over the two-year period of actual revenues

13   reflected in that letter…." Defendant Bishop also stated "actual revenue 'numbers' … have been

14   verified…. as substantially accurate…" Bishop stated this publicly despite reports by internal

15   finance and audit staff personnel that "none of their numbers tied back to the ledger" and that

16   "they often confused fund balances with income which resulted in double counting income on

17   their financial schedules." Moreover, KPMG stated in its report to the University that it could

18   not reproduce the University's methodology or tie its findings to the General Ledger. Defendant

19   Bishop's response is further evidence of impermissible motive.

20   50. Inquiries by Senator Maldonado demonstrate that the matters that Kessler was raising were

21   matters of public concern.

14  Complaint

1    51. The *Los Angeles Times* and *San Francisco Chronicle* carried stories on the KPMG report,

2    evidencing that the financial reporting issues that Kessler had raised were a matter of public

3    concern.

4    52. Reporters for major newspapers submitted public records requests for financial documents

5    that Kessler had questioned and his requests for outside review and/or audit of medical school

6    and for the KPMG report after the University refused to release it, evidencing that the financial

7    reporting issues that Kessler had raised were a matter of public concern.

8    53. Nothing in Kessler's job descriptions or job duties required that he retain outside counsel to

9    analyze and petition the University about improper financial management.

10   54. Nothing in Kessler's job description or job duties required Kessler to go outside of the

11   official chain of command and give the Chair of the Board of Regents information about the

12   University's improper financial management. Kessler did this after he was instructed by Bishop

13   and Dynes' counsel to cease making the type of accusations that Kessler made to Blum.

14   55. Nothing in Kessler's job description or job duties required Kessler to oversee the

15   University's financial accounting systems. Those responsibilities were assigned to other

16   University employees.

17   56. The University's policies that prohibit retaliation are unambiguous and widely publicized.

18   On June 25, 2007, just days before Bishop requested Kessler's resignation, University officials

19   distributed by email to all employees the yearly notification about the University's

20   Whistleblower's Protection Policy which unambiguously stated that retaliation for "protected

21   disclosures" is prohibited. The University also distributed such notifications on, but not limited

22   to, October 19, 2007. Posters that emphasize that the University will protect whistleblowers

1    from retaliation are visible throughout the University. The University's Statement of Ethical

2    Conduct distributed to the University community by Dynes on October 13, 2005 states that

3    "reporting parties, including managers and supervisors, will be protected from retaliation..."

4    University ethics training emphasizes the University's whistleblower protection policy.

5    Defendants Bishop and Dynes, in their personal capacity, had to have known, as any reasonable

6    person would have, that retaliation is impermissible. Evidence that the Bishop and Dynes'

7    representative wrote to Kessler emphasizing Kessler's rights to be free of retaliation before

8    defendants took adverse action is evidence that they had knowledge that retaliation would violate

9    Kessler's rights.

10   57. As a direct result of the conduct of the defendants, Kessler has suffered and continues to

11   suffer economic damages and loss of reputation in the community.

12          COUNT II -- SECTION 1983 RETALIATION IN VIOLATION OF THE PETITION

13                        PROVISIONS OF THE FIRST AMENDMENT

14   58. Defendants Bishop and Dynes, acting under color of state law, retaliated against Kessler in

15   violation of his First Amendment rights to freedom from retaliation and freedom to petition for

16   redress of grievances. Plaintiff incorporates all facts *supra*.

17   59. As noted *supra*, Bishop and Dynes' representatives became concerned that Kessler would

18   petition to seek redress of grievances in the courts. On information and belief, Bishop and Dynes

19   retaliated against Kessler because Kessler had repeatedly petitioned the University for redress of

20   grievances and believed that Kessler was going to petition for redress in the courts.

21   COUNT III– CONSPIRACY TO COMMIT SECTION 1983 RETALIATION IN VIOLATION

22          OF THE SPEECH AND PETITION PROVISIONS OF THE FIRST AMENDMENT

16   Complaint

1    60. Defendants Bishop, Dynes, and Doe conspired to retaliate against Kessler, under color of

2    state law, in violation of his First Amendment rights to freedom from retaliation, freedom of

3    speech, and freedom to petition for redress of grievances. Defendants Bishop, Dynes, and Doe

4    agreed to have Bishop and Dynes engage in retaliatory acts against Kessler. Plaintiff

5    incorporates all facts *supra*.

6    61. Bishop's letter to Kessler of June 29, 2007 requesting his resignation stated "…this decision

7    has been discussed at the highest levels of the University and is uniformly supported as being in

8    the best interests of the Campus and University."

9                                   PRAYER FOR RELIEF

10   WHEREFORE, plaintiff respectfully requests that the Court:

11   1. Declare that the defendants Bishop, Dynes, and Doe, in their personal capacities, jointly and

12   severally, have violated plaintiff's rights in the ways enumerated in this complaint;

13   2. Order the defendants Bishop and Yudof, or their successors, in their official capacities, to

14   immediately reinstate plaintiff to his former positions, with full seniority, and award of salary

15   and benefits from date of any judgment by this Court;

16   3. Award to plaintiff compensatory damages against defendants Bishop, Dynes, and Doe, in their

17   personal capacities, according to proof, exceeding one million dollars, including back pay, front

18   pay, lost benefits, and punitive damages in such amount as will serve as an example to prevent a

19   repetition of such conduct in the future;

20   4. Award to the plaintiff and against Bishop, Dynes, and Doe, in their personal capacities, the

21   costs of this action and reasonable attorneys' fees, if and when incurred in the prosecution of this

22   action along with statutory interest;

1    5. Award to the plaintiff and against all defendants such other and further relief as the Court

2    deems just and proper;

3    6. Conduct a trial by jury on all issues.

4    Dated: December 12, 2008

5
6                                              David A. Kessler
7                                              *Pro se*
8                                              2715 Steiner Street
9                                              San Francisco, CA 94123
10                                             414 929 1199
11

18  Complaint